**STATE OF RHODE ISLAND** **SUPERIOR COURT**
**PROVIDENCE, SC**

**JOHN J. BLACK (a.k.a. "JEFF BLACK"),**
**and JANICE F. H. BLACK**
**("Petitioners" and "Plaintiffs")** **C.A. No. PC 04-4457**
**v.**
**REBECCA J. LEFEBVRE ,**
**TAX ASSESSOR FOR THE TOWN**
**of BARRINGTON, RHODE ISLAND,**
**OFFICIALLY and PERSONALLY**
**("Respondent" and "Defendant")**

**PLAINTIFFS' FIRST REQUEST for PRODUCTION of DOCUMENTS UPON DEFENDANT ("Plaintiffs' Discovery 2 (Do.)")**

In order to prepare for trial, Plaintiffs do now submit written request for production of documents to Defendant in accordance with Rhode Island Superior Court Rules of Civil Procedure ("Rule") Rule 26 and Rule 34.

1) Please provide the documents requested in Plaintiffs' request for hearing information (attached) dated December 20, 2004.

Filed: 5/2/05
BY: Plaintiff:

Janice F. H. Black
3 Colley Court
Barrington, Rhode Island 02806
Telephone: (401) 245 - 2356

Plaintiff:

John J. Black
3 Colley Court
Barrington, Rhode Island 02806
Telephone: (401) 245 - 2356

**STATE OF RHODE ISLAND** **SUPERIOR COURT**
**PROVIDENCE, SC**

**JOHN J. BLACK (a.k.a. "JEFF BLACK"),**
**and JANICE F. H. BLACK**
**("Petitioners" and "Plaintiffs")** | **C.A. No. PC 04-4457**
**v.** |
**REBECCA J. LEFEBVRE ,** |
**TAX ASSESSOR FOR THE TOWN** |
**of BARRINGTON, RHODE ISLAND,**
**OFFICIALLY and PERSONALLY**
**("Respondent" and "Defendant")**

**CERTIFICATION:**

Plaintiffs certify that they have caused to be mailed (U.S.P.S., postage prepaid, return address indicated) on this 1st day of May, 2005 a copy of the above-referred-to **PLAINTIFFS' FIRST REQUEST for PRODUCTION of DOCUMENTS UPON DEFENDANT ("Plaintiffs' Discovery 2 (Do.)")** to Defendants' Legal Counsel:

1) Solicitor Mr. Michael Ursillo
Ursillo, Teitz and Ritch, Ltd.
2 Williams Street
Providence, RI 02903-2918

2) Marc DeSisto, Esquire
"DeSisto Law"
211 Angell Street
Providence, RI 02906

3) Michael A. DeSisto, Esquire
"DeSisito Law"
211 Angell Street
Providence, RI 02906

4) Reserved

BY: Plaintiff:

Janice F. H. Black
3 Colley Court
Barrington, Rhode Island 02806
Telephone: (401) 245 - 2356

Plaintiff:

John J. Black
3 Colley Court
Barrington, Rhode Island 02806
Telephone: (401) 245 - 2356

submitted 12/20/04 - USPS/RRR

(p.3 of 8)

**Appellants: John J. "Jeff" Black & Janice Black**
**Property Address: 3 Colley Court, Barrington, Rhode Island**
**Information Required for Appeal Hearing of 12/31/03 Valuation & Assessment**

**Black - 3 Colley Court**
**Information Request A**
**On Site Inspection by Jerome Appraisal (2002)**

1. Mr. John Mark, of Jerome Appraisal, conducted the on-site inspection of 3 Colley Court during 2002, to verify the property record card data for the 12/31/02 valuation. After Mr. Mark completed his inspection, but before he left the premises, Mr. Mark informed Appellant Mrs. Black that no changes were necessary except that the garage loft should be changed to a non taxable classification. Mr. Mark asked Appellant Mrs. Black to sign a property record card data inspection report, which she did.

a) Please provide a copy of the report that Appellant Mrs. Black signed.

b) Please provide a copy of all of Mr. Mark's work papers, reports, notes, calculations, etc., with respect to his on-site inspection of 3 Colley Court in 2002.

**Black - 3 Colley Court**
**Information Request B**
**Re: Initial Valuation ("IV") Notice, February 20, 2003**

2. The Initial Valuation Notice valuation: $444,000.

a) Please provide all supporting documentation for the $444,000 (other than the property record card). Specifically:

1) The written standard used to determine - "QUALITY", Item # 20, on the property record card.

2) The written standard used to determine - "CONDITION" , Item # 21, on the property record card.

3) The written standard used to determine - "GRADE", Item # 22, on the property record card.

4) The written standard used to determine - "ENCLOSED PORCH", Item # 37, on the property record card.



BINDER 25

Submitted 12/21/04 - USPS RRR O/N 8

(P. 4 of 8)

5) The written standard used to determine - "PHYSICAL DEP", Item # 58, on the property record card.

6)The written standard used to determine - "FUCTIONAL DEP", Item # 59, on the property record card.

7) The written standard used to determine - "ECONOMIC DEP", Item # 60, on the property record card.

8) The written standards, both for measuring, and to determine - "LIVING AREA" on the property record card.

9) The calculations, methodology, and support for the "9" per square foot land pricing which is exactly doubled from the previous rate, as were most other land rates throughout the town that we have verified. Please fully explain this phenomenon.

10) The calculations, methodology, and support for the $99.75 "living area" rate.

11)The calculations, methodology, and support for the $9 "basement" rate.

12)The calculations, methodology, and support for the $12.90 "garage" rate.

13) The calculations, methodology, and support for the $14.50 "porches" rate.

14)The calculations, methodology, and support for the $99.75 "living area" rate.

15) The Assessor's Manual.

16) The written standard used to determine the living area for the square footage designated "TFAT" on the property record card.

17) Sales data for the period 1/1/00 - 7/31/02 was used to calculate the "Assessment to Sales" ratio ("ASR"). The Barrington Tax Assessor said that the property pricing rates were adjusted until an acceptable ASR was achieved. Many 12/31/02 valuations throughout the town were below the actual sales prices for actual sales well prior to 12/31/02. In December 2003, the Barrington Tax Assessor informed Appellant Mr. Black that the 12/31/02 valuations were not at fair market value, nor were they intended

(P.5 of 8)

to be. Please provide us with the percentage of fair market or "full value" that the Barrington 12/31/02 Statistical Update was intended to achieve.

**Black - 3 Colley Court**
**Information Request C**
**<u>Re: Initial Valuation Appeal Hearing with Mr. Battey (3/26/03)</u>**

1. On March 26, 2003, a telephone hearing ("Initial Valuation Appeal Hearing", with respect to the "Initial Appeal") was held with Mr. Battey. Appellant Mr. Black presented information to Mr. Battey indicating that functional and physical depreciation should be increased, to which Mr. Battey responded "now you're talking". Then, later, Appellant Mr. Black reiterated the objections to commercial property and the Rhode Island Country Club ("RICC") not being properly revalued.

a) During the Initial Valuation Appeal Hearing, Mr. Battey seemed receptive to the issues that Appellant Mr. Black raised that would have appropriately reduced the valuation of 3 Colley Court, until the commercial property and RICC club were again raised. Prior to Appelants' hearing, please have Mr. Batty provide Appellants with answers to the following questions:

i) What were the recommendations that Mr. Battey made to the Barrington Tax Assessor, with respect to Appellants' Initial Appeal?

ii) At the time of Appellants' Initial Valuation Appeal Hearing, why didn't Mr. Battey conduct an on-site visit?

iii) Please provide all documentation related to Appellants' Initial Valuation Appeal.

iv) With regard to the PRIV notice, the depreciation adjustments were not allowed and, in fact, an increase was effectuated. Who besides Mr. Battey was involved in Appellants' Initial Appeal and the subsequent PRIV?

iv) During Appellants' Initial Valuation Appeal Hearing, Mr. Battey raised no issues or items that would have increased Appellants' valuation. Was Mr. Battey involved in the subsequent project involving the search for ways to increase Appellants' valuation, such items being those which are reflected in the PRIV notice? Please provide all the details of Mr. Battey's involvement.

**Black - 3 Colley Court**
**Information Request D**
**Re: Punitive Revised Increased Valuation ("PRIV") (5/01/03)**

1. The PRIV, dated May 1, 2003, increased Appellants' Initial Valuation by $13,700, to $457,700. The PRIV states: "If you have any further questions...you may appeal to the Barrington Board of Assessment Review...".

a) Please provide Appellants with supporting calculations, rationale, and standards for each of the many individual items that were changed and reclassified so as to effectuate the PRIV.

b) Please provide Appellant with a complete and detailed explanation of the circumstances surrounding each change including: how, when, why, and where these changes were made, who made the changes, and who authorized and / or directed the changes to be made.

c) In December 2003, the Tax Assessor told Appellant Mr. Black that after Appellants' March 6, 2003 telephone appeal hearing with M r. Battey, the Tax Assessor and Mr. John Mark drove to Appellants' property to seek ways to increase Appellants' valuation. The Tax Assessor boasted that it was "my idea" (meaning the Tax Assessor's idea) to change the garage from "attached" to "detached", resulting in an increase to Appellants' valuation . Which of the other PRIV changes were based on this same secret visit?

d) Many of the changes which resulted in the PRIV involved reclassifying and expanding interior rooms. Please explain this.

e) During the March 16, 2004 portion of Appellants' appeal hearing, the Tax Assessor was not able to explain a 48 square foot discrepancy with respect to the "ONE" area and the "BSM" area. The Tax Assessor explained that the new sketch (the one for the PRIV) was inaccurately depicted on the property record card. The Tax Assessor would not and could not provide Appellants with any documentation to substantiate this 48 square foot discrepancy.

i) Appellants do now request an accurate sketch which agrees with the square footage shown on the PRIV property record card.

ii) Appellants do now require documentation for this 48 square feet discrepancy, the exact measurements, the source of these measurements, and an explanation as to why this additional 48 square feet appears on the PRIV, but was not on the Initial Valuation.

f) The PRIV adds new taxable square footage for a new category labeled "TUAT", that was not on the Initial Valuation Notice.

1) What is this?

2) Please provide the written standard that would allow including any part of such an area in "living space".

3) When were the measurements of this area taken?

4) Why did this item suddenly appear on Appellants' PRIV but was not on the Initial Valuation?

5) Were the measurements and characteristics of this area arrived at during the Assessor's secret visit to Appellants' property?

6) Please provide the documentation and field notes related to the determination to add this new taxable square footage.

g) During their secret visit to Appellants' property, did the Tax Assessor and Mr. Mark not notice that the second floor of Appellants' house includes a steep sloped roof line, such that it is obvious that there are areas where the ceiling height in the second floor is less than the five feet minimum required to be included in "living space"? Why was this not taken into account to reduce the valuation in the PRIV?

h) Please provide the Town's written standards for assessing and determining how ceiling height limitations should be taken into account in measuring living space.

i) Appellants' abutting neighbor received a 5% "TOPO" adjustment (a decrease) to land value during their Initial Valuation Appeal Hearing with the contractor. Please provide the Town's written standards for granting such adjustments.

j) Appellants' "EP" (enclosed porch) was reclassified to "living space", with no explanation on the PRIV. Appellants' enclosed porch is not suitable for year round habitation. Please provide the Town's written standard for enclosed porches versus living space.

k) Who decided to reclassify Appellants' enclosed porch to living space? When was this decided? Please provide all documentation, notes, etc., related to reclassifying Appellants' enclosed porch to living space.

l) The PRIV expands the "living area" assigned to the category labeled "TFAT". Appellants' finished attic space is a small irregularly shaped area, severely limited

by areas with a floor to ceiling height below 5 feet. Who provided these measurements for the increased finished attic area? When was this done? Please provide all documentation, notes, etc., related to increasing Appellants' "TFAT" living area space.

**Black - 3 Colley Court**
**Information Request E**
**Re: Required Witnesses for Appeal Hearing**

Appellants request the following witnesses be present at Appellants' hearing so that Appellants may fully discover how Appellants' valuation, including the punitive increases, were arrived at:

1) Ms. Rebbeca Lefebvre, Tax Assessor, Barrington, Rhode Island, and

2) Mr. Robert Battey, and

3) Mr. John Mark, and

4) Any others who were involved in determining Appellants' valuation, and

5) the Board members will be questioned, under oath, regarding their testimony during Appellants hearings with respect to Appellants' 12/31/02 Appeal.

**Black - 3 Colley Court**
**Information Request F**
**Re: Explain Changes per July 26, 2004 Letter**

Please respond to our July 30, 2004 letter which requests a schedule showing calculations for the valuation changes made by the Board of Assessment Review, per the Assessor's July 26, 2004 letter to Appellants.

**Black - 3 Colley Court**
**Information Request G**
**Re: General Request**

Appellants require all information and comments relating to Appellants' valuation which are not specifically requested previously, to include all memoranda, letters, notes, work papers, computer files, etc., and all information associated with Appellants' property record card, including "comments", etc., that are in the computer but were not provided to Appellants such as the ones to which the Assessor referred during the March 16, 2004 portion of Appellants' hearing.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

JOHN J. BLACK (a.k.a. "Jeff Black"), et al,
*Plaintiffs,*

vs. No. 05-449ML

REBECCA J. LEFEBVRE, et al.,
*Defendants.*

**DEFENDANTS' RESPONSE TO THE PLAINTIFFS' DISCOVERY REQUEST ENTITLED PLAINTIFFS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS UPON DEFENDANT**

Now come the defendants and respond to the plaintiffs' discovery request which contains both requests for production of documents and interrogatory questions. The defendants respond as follows:

**Information Request A**
**On Site Inspection by Jerome Appraisal (2002)**

1. Mr. John Mark, of Jerome Appraisal, conducted the on-site inspection of 3 Colley Court during 2002, to verify the property record card data for the 12/31/02 valuation. After Mr. Mark completed his inspection, but before he left the premises, Mr. Mark informed Appellant Mrs. Black that no changes were necessary except that the garage loft should be changed to a non taxable classification. Mr. Mark asked Appellant Mrs. Black to sign a property record card data inspection report, which she did.

a) Please provide a copy of the report that Appellant Mrs. Black signed.

b) Please provide a copy of all of Mr. Mark's work papers, reports, notes, calculations, etc., with respect to his on-site inspection of 3 Colley Court in 2002.

**Response:**

a) Field Record Card enclosed.

b) Any remarks are made on the Field Record Card.

**Information Request B**
**Re: Initial Valuation ("IV") Notice, February 20, 2003**

2. The Initial Valuation Notice valuation: $444,000.

a) Please provide all supporting documentation for the $444,000 (other than the property record card). Specifically:

1) The written standard used to determine-"QUALITY", Item #20, on the property record card.

2) The written standard used to determine-"CONDITION", Item #21, on the property record card.

3) The written standard used to determine-"GRADE", Item #22, on the property record card.

4) The written standard used to determine-"ENCLOSED PORCH", Item #37, on the property record card.

5) The written standard used to determine-"PHYSICAL DEP", Item #58, on the property record card.

6) The written standard used to determine-"FUNCTIONAL DEP", Item #59, on the property record card.

7) The written standard used to determine-"ECONOMIC DEP", Item #60, on the property record card.

8) The written standards, both for measuring, and to determine-"LIVING AREA" on the property record card.

9) The calculations, methodology, and support for the "9" per square foot land pricing which is exactly doubled from the previous rate, as were most other land rates throughout the town that we have verified. Please fully explain this phenomenon.

10) The calculations, methodology, and support for the $99.75 "living area" rate.

11) The calculations, methodology, and support for the $9 "basement" rate.

12) The calculations, methodology, and support for the $12.90 "garage" rate.

13) The calculations, methodology, and support for the $14.50 "porches" rate.

14) The calculations, methodology, and support for the $99.75 "living area" rate.

15) The Assessor's Manual.

16) The written standard used to determine the living area for the square footage designated "TFAT" on the property record card.

17) Sales data for the period 1/1/00-7/31/02 was used to calculate the "Assessment to Sales" ratio ("ASR"). The Barrington Tax Assessor said that the property pricing rates were adjusted until an acceptable ASR was achieved. Many 12/31/02 valuations throughout the town were below the actual sales prices for actual sales well prior to 12/31/02. In December 2003, the Barrington Tax Assessor informed Appellant Mr. Black that the 12/31/02 valuations were not at fair market value, nor were they intended to be. Please provide us with the percentage of fair market or "full value" that the Barrington 12/31/02 Statistical Update was intended to achieve.

**Response:**

a) The Field Record Card is the supporting document.

1-8) There are no written standards.

9) This is done by adjusting tables to achieve market value. The fact that the land value doubled is a coincidence.

10-14) This is achieved through a test procedure. You keep testing the numbers until you achieve market value.

15) Assessor's Manual enclosed.

16) There are no written standards. The assessor uses her experience and then enters her findings into the computer.

17) RIGL 44-5-12 states that we must assess at full and fair cash value. The assessor's office used color maps showing all valid sales in town along with ratio reports to see that we conform to the law.

**Information Request C**
**Re: Initial Valuation Appeal Hearing with Mr. Battey (3/26/03)**

1. On March 26, 2003, a telephone hearing ("Initial Valuation Appeal Hearing", with respect to the "Initial Appeal") was held with Mr. Battey. Appellant Mr. Black presented information to Mr. Battey indicating that functional and physical depreciation should be increased, to which Mr. Battey responded "now you're talking". Then, later, Appellant Mr. Black reiterated the

objections to commercial property and the Rhode Island Country Club ("RICC") not being properly revalued.

a) During the Initial Valuation Appeal Hearing, Mr. Battey seemed receptive to the issues that Appellant Mr. Black raised that would have appropriately reduced the valuation of 3 Colley Court, until the commercial property and RICC club were again raised. Prior to Appellants' hearing, please have Mr. Battey provide Appellants with answers to the following questions:

i) What were the recommendations that Mr. Battey made to the Barrington Tax Assessor, with respect to Appellants' Initial Appeal?

ii) At the time of Appellants' Initial Valuation Appeal Hearing, why didn't Mr. Battey conduct an on-site visit?

iii) Please provide all documentation related to Appellants' Initial Valuation Appeal.

iv) With regard to the PRIV notice, the depreciation adjustments were not allowed and, in fact, an increase was effectuated. Who besides Mr. Battey was involved in Appellants' Initial Appeal and the subsequent PRIV?

iv) During Appellants' Initial Valuation Appeal Hearing, Mr. Battey raised no issues or items that would have increased Appellants' valuation. Was Mr. Battey involved in the subsequent project involving the search for ways to increase Appellants' valuation, such items being those which are reflected in the PRIV notice? Please provide all the details of Mr. Battey's involvement.

**Response:**

a) i) Mr. Battey did not make any recommendations to the assessor. The initial appeal was with the revaluation company.

ii) John Marks previously inspected the subject property.

iii) Enclosed is the appeal form made out by Mr. Battey.

iv) There was never a PRIV notice. The increase in their assessment was due to comparing their field card with the data collection card. We found discrepancies that we changed resulting in an increase. Mr. Battey, Mr. Marks and myself were the ones to make the changes.

iv) Searching to increase ones value never took place. When we looked at the Property Record Card we saw the discrepancies and we corrected them.

**Information Request D**
**<u>Re: Punitive Revised Increased Valuation ("PRIV") (5/1/03)</u>**

1. The PRIV, dated May 1, 2003, increased Appellants' Initial Valuation by $13,700, to $45,700. The PRIV states: "If you have any further questions...you may appeal to the Barrington Board of Assessment Review...".

a) Please provide Appellants with supporting calculations, rationale, and standards for each of the many individual items that were changed and reclassified so as to effectuate the PRIV.

b) Please provide Appellant with a complete and detailed explanation of the circumstances surrounding each change including: how, when, why, and where these changes were made, who made the changes, and who authorized and/or directed the changes to be made.

c) In December 2003, the Tax Assessor told Appellant Mr. Black that after Appellants' March 6, 2003 telephone appeal hearing with Mr. Battey, the Tax Assessor and Mr. John Mark drove to Appellants' property to seek ways to increase Appellants' valuation. The Tax Assessor boasted that it was "my idea" (meaning the Tax Assessor's idea) to change the garage from "attached" to "detached", resulting in an increase to Appellants' valuation. Which of the other PRIV changes were based on the same secret visit?

d) Many of the changes which resulted in the PRIV involved reclassifying and expanding interior rooms. Please explain this.

e) During the March 16, 2004 portion of Appellants' appeal hearing, the Tax Assessor was not able to explain a 48 square foot discrepancy with respect to the "ONE" area and the "BSM" area. The Tax Assessor explained that the new sketch (the one for the PRIV) was inaccurately depicted on the property record card. The Tax Assessor would not and could not provide Appellants with any documentation to substantiate this 48 square toot discrepancy.

i) Appellants do now request an accurate sketch which agrees with the square footage shown on the PRIV property record card.

ii) Appellants do now require documentation for this 48 square feet discrepancy, the exact measurements, the source of these measurements, and an explanation as to why this additional 48 square feet appears on the PRIV, but was not on the Initial Valuation.

f) The PRIV adds new taxable square footage for a new category labeled "TUAT", that was not on the Initial Valuation Notice.

1) What is this?

2) Please provide the written standard that would allow including any part of such an area in "living space".

3) When were the measurements of this area taken?

4) Why did this item suddenly appear on Appellants' PRIV but was not on the Initial Valuation?

5) Were the measurements and characteristics of this area arrived at during the Assessor's secret visit to Appellants' property?

6) Please provide the documentation and filed notes related to the determination to add this new taxable square footage.

g) During their secret visit to Appellants' property, did the Tax Assessor and Mr. Mark not notice that the second floor of Appellants' house includes a steep sloped roof line, such that it is obvious that there are areas where the ceiling height in the second floor is less than the five feet minimum required to be included in "living space"? Why was this not taken into account to reduce the valuation in the PRIV?

h) Please provide the Town's written standards for assessing and determining how ceiling height limitations should be taken into account in measuring living space.

i) Appellants' abutting neighbor received a 5% "TOPO" adjustment (a decrease) to land value during their Initial Valuation Appeal Hearing with the contractor. Please provide the Town's written standards for granting such adjustments.

j) Appellants' "EP" (enclosed porch) was reclassified to "living space" with no explanation on the PRIV. Appellants' enclosed porch is not suitable for year round habitation. Please provide the Town's written standard for enclosed porches versus living space.

k) Who decided to reclassify Appellants' enclosed porch to living space? When was this decided? Please provide all documentation, notes, etc., related to reclassifying Appellants' enclosed porch to living space.

l) The PRIV expands the "living area" assigned to the category labeled "TFAT". Appellants' finished attic space is a small irregularly shaped area, severely limited by areas with a floor to ceiling height below 5 feet. Who provided these measurements for the increased finished attic area? When was this done? Please provide all documentation, notes, etc., relating to increasing Appellants' "TFAT" living area space.

**Response:**

1) a) All calculations were made within the computer using the tables that have been provided to you. The rationale behind it was to make sure the information in the computer matched the information gathered on the Field Record Card. There are no written standards.

b) Once we looked at the Field Record Card and saw that the information did not match what was in the computer I, as the assessor, instructed Mr. Marks to make the changes. I believe he changed the sketch and I entered the information in the Building Structure screen. The date when this was done I do not know.

c) There was no secret visit. Mr. Marks and I drove out to check their home regarding the garage and if it was attached or detached. Once there it was decided that that garage should be detached in keeping with the consistency throughout town. The other changes were based on Mr. Marks initial visit.

d) Changes were made to reflect what Mr. Marks saw and listed on the Field Record Card.

e) At the time of their hearing I did not have the information at hand so I could not properly calculate the square footage. I did send them the same copies that I am enclosing.

i) Enclosed. This is the Property Record Card showing the information after their appeal to the Board of Assessment Review.

ii) The 48 square feet cannot be drawn on the computer. We are unable to draw an angle that is why the notation angled one story sq ft only is made.

f) 1) TUAT stands for two stories with unfinished attic.

2) By changing this area from a TFAT to a TUAT this means that it is not a finished living area it is unfinished therefore your assessment is lower.

3) This was picked up when Mr. Marks inspected your home.

4) The new information was not entered into the computer, when we found the error we corrected it.

5) There was no secret visit and no this was picked up when Mr. Marks inspected the home.

6) See enclosed Field Record Card under Request A.

g) The roofline is picked up under Roof Type. Your Field Record Card shows that it is a gambrel. A home classified as a gambrel is priced at a lower sq ft price. This depicts the lower wall height due to the slanted roofline. See enclosed computer pricing sheet.

h) There are no written standards; this comes with training and experience. When you assess a home you are using outside dimensions. The assessor does not measure each room inside the home. You then determine the story height of the structure, this is where the ceiling height comes into play. If you have an upstairs with limited wall height you would usually classify that as a finished attic area. With full wall height it would be a two story home.

i) This is determined with a visual inspection and again it comes with training and experience. A TOPO adjustment is a topographical adjustment reflecting a situation that detracts from value.

j) The EP was changed to a ONE because it is heated.

k) Mr. Marks listed this when he went to inspect your home. See enclosed Field Record Card.

l) This was listed when Mr. Marks inspected your home. See enclosed Field Record Card.

**Information Request E**
**Re: Required Witnesses for Appeal Hearing**

Appellants request the following witnesses be present at Appellants' hearing so that Appellants may fully discover how Appellants' valuation, including the punitive increases, were arrived at:

1) Ms. Rebecca Lefebvre, Tax Assessor, Barrington, Rhode Island, and

2) Mr. Robert Battey, and

3) Mr. John Mark, and

4) Any others who were involved in determining Appellants' valuation, and

5) the Board members will be questioned, under oath, regarding their testimony during Appellants hearings with respect to Appellants' 12/31/02 Appeal.

**Response:**

No response required.

**Information Request F**
**<u>Re: Explain Changes per July 26, 2004 Letter</u>**

Please respond to our July 30, 2004 letter which requests a schedule showing calculations for the valuation changes made by the Board of Assessment Review, per the Assessor's July 26, 2004 letter to Appellants.

**Response:**

I do not have a July 30, 2004 letter addressed to me in my files. However, in response to their request for a schedule showing calculations for the changes made to their assessment the Board of Assessment Review changed the number of stacks from 2 to 1 under fireplaces and changed the garage from detached to attached. Enclosed are the computer generated sheets showing the calculations for the before and after assessments.

**Information Request G**
**<u>Re: General Request</u>**

Appellants require all information and comments relating to Appellants' valuation which are not specifically requested previously, to include all memoranda, letters, notes, work papers, computer files, etc., and all information associated with Appellants' property record card, including "comments", etc., that are in the computer but were not provided to Appellants such as the ones to which the Assessor referred during the March 16, 2004 portion of Appellants' hearing.

**Response:**

Objection, this is a catch all request that is too vague to answer.

C.A. No. 05-449ML

Rebecca J. Lefebvre

STATE OF RHODE ISLAND
COUNTY OF BRISTOL

***Subscribed and sworn to before me on this*** 9th ***day of*** JANUARY ***2006.***

JoAnn C. Mangione
Notary Public of Rhode Island
My Commission Expires 08/10/09

NOTARY PUBLIC
My Commission Expires 8/10/09

Defendants,
By their attorneys,

Marc DeSisto, Esq. # 2757
Michael A. DeSisto, Esq. (#2444)
DESISTO LAW
211 Angell Street
P.O. Box 2563
Providence, RI 02906
(401) 272-4442
(401) 272-9937 fax

C.A. No. 05-449ML

**CERTIFICATION OF SERVICE**

I hereby certify that a true and accurate copy of the within was mailed on this 10th day of January, 2006 to:

John J. and Janice F.H. Black
3 Colley Court
Barrington, RI 02806

Michael A. Ursillo #2676
URSILLO, TEITZ & RITCH, LTD.
2 Williams Street
Providence, RI 02903
(401) 331-2222

Laura Serge